# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

ERIN C. MEDOVICH,                §
                                 §
            *Plaintiff*,          §
                                 §
*versus*                          §    CIVIL ACTION NO. 3:13-1244
                                 §
CAROLYN W. COLVIN,               §
Acting Commissioner of           §
Social Security,                 §
                                 §
            *Defendant*.          §

## <u>REPORT AND RECOMMENDATION</u>

Erin C. Medovich ("Medovich") seeks review of a decision denying his application for disability insurance benefits under the Social Security Act.[1]

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision.  *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).  Neither

---

[1]     Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability.

can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

## II. Background

Born in 1985, Medovich graduated from high school, and began work toward a nursing degree. (T. 56). She held various jobs including nurse's aide, pharmacy technician, and food service worker. (T. 158). She quit work in March, 2009, to stay home with her baby. (T. 157).

In October, 2009, at age 24, Medovich had two cerebellar vascular accidents ("CVAs").[2] (T. 212, 288). Medovich asserts that she thereafter experienced chronic hives, memory loss, and left-sided weakness. (T. 50). She takes medications to control blood clotting (Warfarin) and hives (Allegra). (T. 18, 52, 56). She feels frustrated, and puts herself down. She takes an antidepressant medication (Celexa), but has not been treated professionally for any mental disorder. (T. 18, 51, 53).

In January, 2011, Medovich applied for disability insurance benefits, alleging that she became unable to work as of October 28, 2009, due to stroke, antiphosopholipid antibody syndrome ("APS"),[3] short term memory loss and left side weakness. (T. 157). Her claim was assigned to administrative law judge,

---

[2] Cerebellar vascular accident is the medical term for stroke.

[3] Antiphospholipid syndrome ("APS") is described as follows:

Antiphospholipid syndrome occurs when your immune system mistakenly attacks some of the normal proteins in your blood. Antiphospholipid syndrome can cause blood clots to form within your arteries or veins. It can also cause pregnancy complications, such as miscarriage and stillbirth.

Antiphospholipid Syndrome, The Mayo Clinic, http:// www. mayoclinic.org/ diseases-conditions/antiphospholipid-syndrome/basics/definition/con-20028805 (last visited Jan. 13, 2015).

Ronald Sweeda ("ALJ Sweeda"), who conducted an evidentiary hearing. (T. 44-76). Medovich, represented by legal counsel, attended and testified. (*Id*.). ALJ Sweeda also received testimony from an impartial vocational expert, Karen Kane, M.S., ("VE Kane") and Erik Medovich, claimant's husband. (*Id*.).

ALJ Sweeda denied Medovich's application in a written decision dated June 8, 2012. (T. 11-22). The Appeals Council denied Medovich's request for review. (T. 1-4). Medovich then instituted this proceeding.

### III.  Commissioner's Decision[4]

 ALJ Sweeda found that Medovich last met insurance requirements for Title II disability benefits on June 30, 2011. Consequently, the relevant period was October 28, 2009 (her alleged onset date), to  June 30, 2011. (T. 13).  For that period, ALJ Sweeda found that Medovich had severe impairments including "obesity, coagulation, and status-post cerebellar vascular accident." (T. 13).

These impairments, while not of such severity as to be presumptively disabling under the Commissioner's "Listings,"[5] reduced Medovich's capacity for work-related activities.  Her *physical* residual functional capacity was diminished to the extent she could engage in work activities only at the light exertional level.   That capacity was further decreased by postural,

---

[4]     ALJ Sweeda utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[5]     The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected.   *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.   Listed impairments are presumptively disabling.   *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d).

environmental, and mental limitations. Specifically, Medovich could perform only simple, repetitive tasks involving simple judgments, and she could not climb or be exposed to temperature extremes, high humidity, unprotected heights or dangerous machinery.[6] (T.15).

VE Kane testified hypothetically that a person with such capacity would be unable to perform Medovich's past relevant work as a nurse's aide and pharmacy technician because such positions either are semi-skilled work and/or performed at medium exertional capacity or greater. (T. 20, 71). ALJ Sweeda asked VE Kane whether other available jobs exist that such a person can perform. (T. 71-72). VE Kane responded affirmatively, and identified representative occupations of "ticket taker" (light/unskilled), ticket seller (light/unskilled), and cashier (light/unskilled), all of which exist in significant numbers in northeastern Pennsylvania where Medovich resided. (T. 72).

Based on VE Kane's testimony and the framework of Medical-Vocational Rule 202.21,[7] ALJ Sweeda concluded that a finding of "not disabled" was appropriate. (T. 21-22).

---

[6] ALJ Sweeda's full residual functional capacity finding was:

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she cannot climb and she cannot be exposed to temperature extremes, high humidity, unprotected heights or dangerous machinery. The claimant is limited to simple, repetitive tasks involving simple judgment.

(T. 15).

[7] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. The Medical-Vocational Guidelines are a matrix of general findings – established by rule – as to whether work exists in the national economy that a person can perform. They "take into account a claimant's residual functional capacity, as well as her age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n. 1 (2d Cir. 2009) (summary order) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)).

## IV.  Points of Alleged Error

Medovich's brief presents three points of error, as follows:

1. The ALJ was in error when he failed to give significance, failed to properly consider and failed to explain why he was rejecting [] the opinions of treating source Dr. H. Paliwal and consultative examiner Dr. Deryck Brown;

2. The ALJ was in error when he failed to present a hypothetical question to a vocational expert that identified all of the plaintiff's impairments and limitations as indicated by the record and failed to sustain his burden of identifying occupations which the plaintiff could perform; and

3. The ALJ was in error when he failed to fulfill his affirmative duty to assist the claimant in development of the record.

(Dkt. No. 12, p. 9).[8]

## V.  Adequacy of Administrative Record (Point 3)

If ALJ Sweeda failed to develop the record adequately, a reviewing court cannot determine whether his decision is supported by substantial evidence. *See Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  Adequacy of the record is a threshold issue that affects whether remaining issues are ripe for review. Accordingly, Medovich's third point of error must be considered first.

After filing her claim, Medovich was examined by a consultative physician, Dr. Deryck Brown, M.D., a family practitioner retained by the Social Security Administration.  Dr. Brown submitted a report stating in part:

> The claimant has had a stroke in the frontal lobe, so there may be personality disorders down the road.  It depends on how much she

---

[8] Although this case was filed in the Northern District of New York, which is within the Second Circuit, Medovich's brief cites and relies almost exclusively on Third Circuit and other out-of-circuit cases.  Generally, these cases do not appear to be at odds with Second Circuit case law, and the Commissioner has not objected to any of Medovich's authorities as being inconsistent with governing circuit law.

regains, and naturally has [not] fully recovered everything as yet. At the present time, she has lost about 10% of her executive functions and her strength especially in the left side. She has also had damage to her cerebellum on the left side. This was quite well displayed when we did pars pointing and diadochokinesis test and this came back positive for the left upper arm. This is not surprising, because the left cerebellum was damaged inferiorly. Also, she carries the antiphospholipid antibody, which puts her at risk for clotting. For the moment, she is still now post-recovery and we are not sure how much further recovery can occur, but her executive functions are somewhat affected, her strength on the left side and she is at risk for further strokes. Thus, I am not sure if it [is] very safe for her to be working carrying this problem with her.

(T. 333).

ALJ Sweeda summarized all of Dr. Brown's objective findings and medical opinions in his decision. Medovich argues that instead of merely *reciting* them, ALJ Sweeda should have *recontacted* Dr. Brown for "additional explanation as to his findings." (Dkt. No. 12, p.15). Medovich does not proffer *why* she thinks Dr. Brown should have been recontacted, but one might infer (from her argument concerning a different point of error) that Medovich believes that the above-quoted portion of Dr. Brown's report "is consistent with a finding of disability" (*Id.*, p. 11), and that ALJ Sweeda *rejected* it "without adequate explanation." (*Id.*, p. 15).

A.     *Duty to Develop Record*

Claimants possess rights to administrative records adequately developed to the point that fair and informed decisions can be reached thereon. "This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, 20 C.F.R. § 404.1512(d)-(f) (1995), and exists even when, as here, the claimant is represented by counsel." *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)). In the Social Security

context, this duty is *sui generis*. "Social Security disability determinations are investigatory, or inquisitorial, rather than adversarial." *Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir. 2009) (internal quotation marks omitted). "It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Id.* (internal quotation marks omitted); *accord Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). Correlative to this duty, administrative law judges must recontact treating physicians or other medical sources, and request additional information when evidence in hand is inadequate to determine whether claimants are disabled. 20 C.F.R. §§ 404.1512(e), 404.1520b(c); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (when there is an inadequate medical record, an administrative law judge must *sua sponte* seek additional information).

Failure to develop the record adequately is an independent ground for vacating the Commissioner's decision. *See Moran,* 569 F.3d at 114-15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision."); *see also Daviau v. Astrue*, No. 09–CV–0870 (MAD), 2012 WL 13543, at *6 (N.D.N.Y. Jan. 4, 2012). An affirmative obligation to develop an administrative record does not extend to infinity, however, and is not without limit. *See Guile v. Barnhart*, No. 5:07-cv-259 (GLS), 2010 WL 2516586, at *3 (N.D.N.Y. June 14, 2010). Reviewing courts require only *reasonable* efforts to help claimants get medical reports from their own medical sources. *See Perez*, 77 F.3d at 47. Administrative law judges are not required to seek additional information absent "obvious gaps" that preclude an informed decision. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999); *see also Hart v. Commissioner of Soc. Sec.*, No. 5:07–CV–1270 (DNH), 2010 WL 2817479, at *5 (N.D.N.Y. July 10, 2012).

*B.*    *Application*

Medovich identifies no obvious gaps triggering a duty to further develop the record *sua sponte*. The record contained a complete medical history of Medovich, including hundreds of pages of treatment records, progress notes, and consultative reports. (T. 210-389). It was adequate to permit ALJ Sweeda to make an informed disability determination. Medovich identifies no omissions or ambiguities in Dr. Brown's consultative report. Hence, Medovich's claim that ALJ Sweeda was obligated *sua sponte* to recontact Dr. Brown with interrogatories for some unspecified "additional explanation" lacks merit. *See Carvey v. Astrue*, 380 Fed. App'x 50, 52 (2d Cir. 2010) (summary order) ("because the record evidence was adequate to permit the ALJ to make a disability determination, we identify no merit in Carvey's claim that the ALJ was obligated *sua sponte* to recontact the treating physicians").

In sum, there is no compelling reason to reverse the Commissioner's decision on the basis of an inadequate record simply because ALJ Sweeda did not recontact consultative examining physician, Dr. Brown, with additional, unspecified interrogatories.[9]

---

[9]    Medovich also infers bias, claiming that ALJ Sweeda "has gone out of his way to deny benefits and did not assist the Plaintiff in developing the record both for and against an award of benefits." Dkt. No. 12, p. 15-16). This inference is unsupported by the record. The hearing transcript reveals that at the beginning of the hearing, ALJ Sweeda asked Medovich's counsel if he had the opportunity to review the documentary evidence, accepted additional documents at the hearing, and offered to keep the record open for 10 additional days to allow submission of additional records. (T. 46-47). As mentioned above, the administrative record is voluminous, and Medovich has identified nothing other than unfocused and indeterminate "interrogatories" that might be added to it.

# VI. Residual Functional Capacity

Before making findings at Steps 4 and 5 of sequential evaluation, administrative law judges first assess and articulate claimants' "residual functional capacity." This term refers to what claimants can still do in a work setting despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. § 404.1545; *see also Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996). When assessing residual functional capacity, administrative law judges must consider "all of the relevant medical and other evidence," including subjective complaints of pain. *See* 20 C.F.R. § 404.1545(a)(3).

## A. *Medovich's Challenges*

Medovich attacks ALJ Sweeda's residual functional capacity finding from several angles with arguments indiscriminately interspersed within her three points of error. Medovich argues, first, that this finding is flawed because it gave inadequate weight to opinions of her treating physician, Dr. H. Paliwal M.D., and consultative examiner Dr. Brown (argued under Point 1). Next she contends that the finding is infirm because it did not incorporate all limitations (*i.e.*, reduced strength in left hand and arm, memory problems, and inability to sustain attention) (argued under Point 2). Finally, she asserts that ALJ Sweeda's credibility assessment of Medovich's subjective testimony was flawed

because it did not acknowledge her extensive work history and then use it as a basis for giving credence to her testimony that she was unable to work due to impairments (argued under Point 3).

B.    *Weighting of Medical Evidence*

Medovich was treated by numerous physicians at the Guthrie Clinic in Sayre, PA, as well as physical therapists. She takes issue with ALJ Sweeda's handling of the evidence from treating physicians, Himanshu Paliwal, M.D., and Priyantha Herath, M.D., and from the aforementioned consultative examiner, Dr. Brown. That evidence, along with a report from a State Agency reviewing physician, Anne C. Zaydon, M.D. is summarized as follows:

*Himanshu Paliwal, M.D.*

Following her strokes and release from the hospital, Medovich followed up treatment at the Guthrie Clinic with several physicians. On November 9, 2009, she was seen by family practitioner, Dr. Paliwal. Medovich reported weakness, particularly in her left hand, and one episode of self-resolving dizziness. (T. 289). She denied depression. (*Id*.). On examination, Dr. Paliwal found Medovich alert and oriented; her affect and judgment were normal; and she had normal gait, reflexes and sensation. (T. 289-90). Coordination was noted as abnormal, and grip strength was weaker on the left than the right. (T. 290).

On November 30, 2009, Medovich returned to Dr. Paliwal for cholesterol testing. (T. 279-81). She reported that her left hand weakness was improving with physical therapy. (T. 279). She denied symptoms of neurological impairment; she had no disturbance of motor or sensory function and no loss of balance or vertigo. (*Id*.). Medovich's phyical examination was normal. (T. 281).

On March 25, 2010, in a follow-up appointment for hives, Dr. Paliwal noted that Medovich "has recovered from the stroke except for some difficulty in fine motor function of left fingers." (T. 264). She had stopped taking aspirin and Simvastatin because she does not like to be on medication. (*Id*.). She further stated that stopping aspirin discontinued her hives. (*Id*.).

*Priyantha Herath, M.D.*

Medovich visited with Guthrie Clinic neurologist, Dr. Herath, on November 11, 2009, (two days after her follow-up appointment with Dr. Paliwal). (T. 285-87). Her neurological examination was normal; she demonstrated full strength in all tested muscles. (T. 286). She was alert, her speech and language were intact, and she displayed no cognitive deficits. (*Id*.). Dr. Herath opined that "[f]unctionally, [Plaintiff] is not disabled at all. There are no residual neurological symptoms." (T. 285). Her impression was that Medovich was "neurologically and functionally intact." (T. 287). Accordingly, Dr. Herath concluded that she would see Medovich "PRN"[10] or in about 6-8 months. (*Id*.).

*Deryck Brown, M.D.*

On June 3, 2011 (subsequent to having applied for disability insurance benefits), Medovich underwent a forensic consultative examination with family medicine practitioner, Dr. Brown. (T. 329-333). Dr. Brown noted Medovich as pleasant and intelligent, and that she answered questions well despite gaps in her memory. (T. 332). She reported memory loss and problems with balance and equilibrium, particularly when going up stairs or uneven surfaces. (T. 329-30). She further reported that she had lost 10% of her "executive functions" and

---

[10]     "PRN" is medical abbreviation meaning "when necessary."

coordination. (T. 330). Additionally, since her stroke, she had a few episodes of vertigo. She further claimed depression. (*Id*.).

Upon physical examination, Dr. Brown observed Medovich had normal gait and could carry out heel-toe walking without looking at her feet. (T. 332). She had a full range of motion in all joints and full strength (5/5) in all muscles, except in her left foot, where strength was 4+/5. (*Id*.). Dr. Brown found that Medovich's right hand grip was slightly stronger than in her left. (*Id*.). Dr. Brown opined that Medovich had lost 10% of her executive functions and strength, especially on the left side. (T. 333). Dr. Brown further opined that Medovich, who had damage to her cerebellum on the left side and carried the antiphospholid antibody, was at risk for clotting. (*Id*.). Dr. Brown speculated that he was "not sure if it [is] very safe for her to be working carrying this problem with her." (*Id*.).

Dr. Brown opined that Medovich was able to carry about 30 pounds infrequently; had no limit for sitting; and could probably stand or walk up to 3 hours at a time. (T. 331). She could push and pull a shopping cart without a problem, and bend, kneel, stoop, crouch, balance and climb occasionally. (*Id*.). Medovich had no problems with reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting, or smelling. (*Id*.). She had difficulty climbing stairs and could not climb a ladder. (*Id*.). Medovich had restrictions for temperature extremes, fumes, odors, gasses, and flashing lights. (*Id*.).

*Anne C. Zaydon, M.D.*

On June 23, 2011, a nonexamining State agency consultant, Dr. Zaydon, reviewed the longitudinal medical evidence, and opined that Medovich had

residual functional capacity to lift and/or carry up to 50 pounds occasionally and 25 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and occasionally crouch, crawl, and climb ramps and stairs. (T. 83-84). Dr. Zaydon further opined that Medovich should avoid concentrated exposure to temperature extremes, humidity, wetness, and respiratory irritants, and should avoid all exposure to hazards such as machinery and heights. (T. 84).

1.   Governing Law

Administrative law judges must give controlling weight to forensic medical opinions of "treating sources"[11] regarding the nature and severity of impairments, provided they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record. *See* 20 C.F.R. § 404.1527(c)(2); *see also* SSR 96–2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *1–2 (SSA July 2, 1996) (explaining controlling-weight factors). But, when treating source opinion swims upstream, contradicting other substantial evidence, such as opinions of other medical experts, it may not be entitled to controlling weight. *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643–44 (2d Cir. 2007) (summary order); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). Likewise, a treating physician's opinion may be discounted when it is internally

---

[11]     *See* 20 C.F.R. § 404.1502 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

inconsistent. *See Micheli v. Astrue*, 501 Fed. App'x 26, 28 (2d Cir. 2012) (summary order).

When *controlling* weight is not afforded to treating source opinion, and also when opinions from other acceptable medical sources are evaluated with respect to severity of impairments and how they affect individuals' ability to function, the degree of weight to be given such evidence is determined by applying certain generic factors prescribed by regulation: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) evidence supporting the opinion; (4) how consistent opinion is with record as a whole; (5) specialization in contrast to condition being treated; and (6) other significant factors. *See* 20 C.F.R. § 404.1527(c)(1)-(6); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

2. <u>ALJ Sweeda's Assessments of Medical Opinion</u>

As for treating source evidence, ALJ Sweeda summarized, but did not assign any specific weight to Dr. Paliwal's treatment notes. ALJ Sweeda also noted Dr. Herath's neurological opinion that Medovich was not disabled at all with no residual neurological symptoms, but gave it only *some* weight because she only saw Medovich one time, and because it was consistent with minimal findings in later examinations. (T. 20).

As for consultative evidence, ALJ Sweeda also summarized, but did not assign specific weight to Dr. Brown's examination report, but clearly adopted Dr. Brown's assessments in several respects. When articulating Medovich's residual

functional capacity ALJ Sweeda found, as did Dr. Brown, that Medovich had reduced coordination and environmental restrictions. (*See* n. 6, *supra*.)

ALJ Sweeda gave *some* weight to Dr. Zaydon's opinion that Medovich is able to perform medium work, but only to the extent it subsumed ability to perform the lesser exertional category of light work. ALJ Sweeda explained that due to complaints of left-sided weakness and findings of minimal loss of motor strength, he limited Medovich to light exertional work. (T. 20).

3. <u>Allegations of Error</u>

Medovich argues that ALJ Sweeda "failed to give significance, failed to properly consider and failed to explain why he was rejecting to (*sic*) the opinions of treating source Dr. H. Paliwal and consultative examiner Dr. Deyrck Brown." (Dkt. No. 12, p. 9). Medovich contends that Dr. Paliwal found that she suffered from multiple impairments as a result of her stroke, and that ALJ Sweeda erred in substituting his lay opinion for that of a treating medical professional. (*Id.*, pp. 10-11). Somewhat similarly, Medovich contends that Dr. Brown's testimony was consistent with a finding of disability, and that ALJ Sweeda erred in failing to explain why Dr. Brown's evidence was rejected. (*Id.*, p. 11-12). Further, in a reply brief, Medovich adds an argument that ALJ Sweeda erred in relying on the one-time evaluation of neurologist Dr. Herath. (Dkt. No. 14, pp. 20-21). She contends that it was not consistent with the medical evidence of other treating physicians at the Guthrie Clinic. (*Id.*). Additionally, in her reply brief, she faults ALJ Sweeda for considering the opinion of State agency Dr. Zaydon because she "only reviewed the record" and "relied on Dr. Priyantha Herath's statement that the Claimant was not disabled." (Dkt. No. 14, pp. 21-22).

4.    Application

ALJ Sweeda did not violate the treating physician rule or the regulation prescribing how medical opinions are evaluated because Dr. Paliwal expressed no forensic or other opinion regarding Medovich's functional capacities or limitations.  ALJ Sweeda also did not substitute his lay opinion for Dr. Paliwal's professional medical opinions.  ALJ Sweeda carefully documented Dr. Paliwal's relevant progress notes and findings, including her early examinations *shortly after her stroke* that noted "abnormal cerebellar examination" and "coordination was abnormal."  (T. 15).  But, in March 2010, Dr. Paliwal recorded that Medovich had *recovered* from her stroke.  (T. 264).  Thus, nothing supports a contention that ALJ Sweeda *rejected* Dr. Paliwal's findings.  If anything, ALJ Sweeda *accepted* Dr. Paliwal's finding that Medovich had recovered from her stroke when finding that she Medovich is capable of performing light work with limitations.

Medovich's contention that ALJ Sweeda rejected Dr. Brown's opinion also fails.  Although Medovich contends that Dr. Brown's opinion "is consistent with a finding of disability," it instead *supports* ALJ Sweeda's residual functional capacity assessment for a limited range light work.[12]  (T. 331-32).  Dr. Brown's

---

[12]     The Commissioner's regulation defines light work as:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).  To perform a full range of light work, one must have ability to stand or walk, off and on, for a total of approximately six hours of an eight-hour workday. *See* SSR 83-10, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK—THE MEDICAL–VOCATIONAL RULES OF APPENDIX 2, 1983 WL 31251, at *5-6 (SSA 1983).

findings that Medovich was capable of carrying *more than* 20 pounds, sitting without limitation, standing or walking for three hours, pushing or pulling without problems, no postural difficulties except climbing, and few environmental restrictions related to temperature, fumes, odors, and gases, are findings that Medovich's capacities are well within the requirements of light and/or sedentary work.[13] *See* 20 C.F.R. § 404.1567(b). And, as noted above, ALJ Sweeda *credited* Dr. Brown's assessments that Medovich needed reduced coordination and environmental restrictions. (T. 15).

Medovich equates Dr. Brown's speculation that it might not be safe for her to work as an expression of an opinion of disability. That observation, however, was not an assessment of Medovich's physical and mental capacities for engaging in work-related activities. It was rather a concern that safety might be a concern in some work environments. ALJ Sweeda acknowledged this concern, and addressed them through residual functional capacity limitations restricting Medovich from work involving climbing and exposures to temperature extremes, high humidity, unprotected heights or dangerous machinery.

Medovich's contention that ALJ Sweeda erred by relying on both Dr. Herath's and Dr. Zaydon's opinions lacks merit. ALJ Sweeda specifically acknowledged that Dr. Herath only saw Medovich one time and that was the basis for only giving her opinion *some* weight. (T. 20). Similarly, ALJ Sweeda only gave *some* weight to Dr. Zaydon's opinion that she had the ability to

---

[13]     Sedentary work is subsumed in residual functional capacity for light work.  *See* 20 C.F.R. § 404.1567(a)-(b)

perform medium exertional work. (T. 20). Further, it is apparent from limitations set forth in Dr. Zaydon's assessment that Dr. Zaydon did not adopt Dr. Herath's opinion. (T. 83-84). The same is true, as stated above, for ALJ Sweeda. (T. 15-20). As such, Medovich's improper reliance claims are without merit.

In sum, careful examination discloses no violation of the treating physician rule or other error in weighting of medical evidence when determining Medovich's residual functional capacity.

## C.    Alleged Failure to Incorporate All Limitations

Medovich argues that ALJ Sweeda's residual functional capacity finding is flawed because it does not incorporate all of her postural and/or nonexertional limitations. (Dkt. No. 12, pp. 12-14). Specifically, Medovich contends that ALJ Sweeda did not include her reduced strength in her left hand and arm, memory problems, and inability to sustain attention in that finding.

### 1.    Governing Legal Principles

The Commissioner provides guidance for residual functional capacity assessments in a formal regulation and an internal policy ruling. *See* 20 C.F.R. §§ 404.1513(c)(1), 404.1545(a)(2), 404.1545(b), 404.1569a(a); *see also* SSR 96–8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *4 (SSA July 2, 1996). When making a finding regarding residual functional capacity, administrative law judges must consider all of the claimant's impairments, including exertional, nonexertional, severe and nonsevere. SSR 96–8p, at *5-6.

2.    Application

ALJ Sweeda incorporated into his articulation of physical residual functional capacity all functional limitations that he found to be established by the evidence.  While the record contains notations of minimal left hand/arm weakness, ALJ specifically took this into account by limiting Medovich to light work.  (T. 20).  Medovich fails to point to any evidence demonstrating that she had restrictions in her left extremity not taken into account by ALJ Sweeda in the residual functional capacity assessment.[14]

With respect to mental capacity, the evidence consistently recorded Medovich as alert and oriented, with normal affect and mood, intact speech and language, normal memory and judgment, and no cognitive deficits.  (T. 238, 243, 261-62, 269, 281, 284, 286, 289-90).  ALJ Sweeda incorporated in the residual functional capacity assessment mental limitations, restricting Medovich to simple, repetitive tasks involving simple judgment.  (T. 15).  ALJ Sweeda further found that she could not perform her past relevant work, in part, due to these limitations.  (T. 20).  These limitations were designed to accommodate both memory and attention deficits.

Medovich again fails to point to any evidence demonstrating that during the relevant period she had mental limitations beyond those taken into account by ALJ Sweeda in the residual functional capacity assessment.

---

[14]    Indeed, the record suggests just the opposite.  Physical therapist, David Martin, MSPT, CSCS, noted in December 2009 progress notes under "functional comments," that "Pt is doing well.  Her hand strength and UE strength has greatly improved....  Objectively, she has increased her strength to functional levels." (T. 217).

*D.     Weighting of Subjective Testimony*

ALJ Sweeda assiduously summarized Medovich's subjective testimony in his decision.  (T. 17-18).  Afterward, ALJ Sweeda concluded:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause [her] alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(T. 19).  Medovich argues that this credibility determination is infirm because ALJ Sweeda disregarded her extensive work history.[15]  (Dkt. No. 12, p. 16).

1.     <u>Governing Legal Principles</u>

Testimony from claimants regarding persistence, intensity and limiting effects of symptoms is not only relevant, but desirable.  On the other hand, it is subjective and may be colored by interest in obtaining a favorable outcome.  An administrative law judge must, therefore, engage in a difficult task of deciding how much weight to give claimants' subjective self-evaluations.

The Commissioner provides explicit guidance for such undertakings.  First, a formally promulgated regulation requires consideration of seven objective factors that naturally support or impugn subjective testimony of disabling pain and other symptoms.[16]  Second, an interpretive ruling directs

---

[15]     This argument smacks of tongue-in-cheek given that Medovich only worked to age 24.

[16]     An administrative law judge must evaluate a claimant's symptoms, including pain, based on  medical and other evidence, including the following factors:

(i)     claimant's daily activities;
(ii)    location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii)   precipitating and aggravating factors;

(continued...)

administrative law judges to follow a two-step process to evaluate claimants' allegations of pain. SSR 96–7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996). The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

### 2. Application

ALJ Sweeda evaluated credibility of Medovich's subjective symptoms based on the requirements of 20 C.F.R. § 404.1529. (T. 15, 17). This indicates his awareness of correct legal principles and his intention to apply them. *See Britt v. Astrue*, 486 Fed. App'x 161, 164 (2d Cir. 2012) (summary order) (finding explicit mention of 20 C.F.R. § 404.1529 and SSR 96–7p as evidence that the administrative law judge used the proper legal standard in assessing the claimant's credibility).

ALJ Sweeda cited multiple reasons, all supported by substantial evidence, for finding Medovich's subjective testimony not fully credible. These included

---

[16](...continued)
(iv)   type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v)    treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi)   measures claimant uses or has used to relieve pain or other symptoms; and
(vii)  other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c).

inconsistent testimony,[17] objective medical evidence showing minimal-to-no residual effects,[18] ability to perform all personal-need and household tasks during the relevant period,[19] lack of prescribed medication for alleged symptoms,[20] and noncompliance with treatment recommendations.[21]

Undoubtedly, a steady and lengthy work history can bolster a claimant's credibility regarding intensity, persistence and limiting effects of her symptoms. *See* 20 C.F.R. § 404.1529(c)(3); *see also Schaal*, 134 F.3d at 502 ("a good work history may be deemed probative of credibility"). The fact that ALJ Sweeda did not *mention* Medovich's work history does not mean, however, that he did not *consider* it. Mere failure to mention or discuss work history, particularly with respect to a claimant who ceased work at a very young age of 24, cannot be the

---

[17]     Medovich testified that she tried working as a transcriptionist but never really made any money at it. (T. 19). She further stated that she cannot work as a result of residual effects of a stroke, which are chronic hives, but she later testified that Allegra works well in controlling hives. (*Id.*). She alleged overall joint pain, but her physical examinations do not document any loss of range of motion or tenderness. (*Id.*).

[18]     Medovich stated that she cannot work due to decreased memory and left-sided weakness; however, as noted by ALJ Sweeda, the objective medical evidence showed Medovich had a brief period of physical therapy with only minimal limitation on the left and progress notes showed minimal to no residual weakness on her left side. Moreover, Medovich is right-hand dominant and there is no objective medical evidence of any limitation on her right side. (T. 20).

[19]     Medovich's daily activities are inconsistent with allegations of disability. Medovich's activities include being the primary care taker of her three-year-old daughter, cooking, cleaning, doing laundry, ironing, shopping, managing finances, reading, painting, watching television, and baking. (T. 55, 184-86). She further reported that she regularly attended church, went to post office, and participated in young married couples. (T. 186). ALJ Sweeda noted that Medovich's daily activities undermine her credibility. (T. 20).

[20]     ALJ Sweeda noted that she complained of vertigo and stated that she has migraines weekly, but she has not been prescribed any medication for these problems. (T. 20).

[21]     Medovich did not see an allergist as recommended, claiming that she cancelled the appointment with the allergist because she did not want to stop taking Allegra for five days in order to have the testing done. (T. 16, 234, 236). Additionally, Medovich failed to fill a prescription for anti-clotting medication because she never would have taken it four times a day. (T. 16, 234).

basis for reversing a subjective credibility determination. *See Wavercak v. Astrue*, 420 Fed. App'x 91, 94 (2d Cir. 2011) (summary order) ("That Wavercak's good work history was not specifically referenced in the ALJ's decision does not undermine the credibility assessment, given the substantial evidence supporting the ALJ's determination.").

Work history, moreover, is not one of the seven evaluative factors prescribed by regulation. Nor is there authority suggesting that good work history trumps other valid reasons for partially discrediting subjective testimony. *See Campbell*, 465 Fed. App'x at 7 ("Although it is true that 'a good work history may be deemed probative of credibility,' it remains 'just one of many factors' appropriately considered in assessing credibility." (internal citations omitted)).

Absent flagrant disregard of governing law, nothing in social security jurisprudence is more firmly established than that it is the prerogative of the Commissioner, not reviewing courts, to resolve evidentiary conflicts and to appraise credibility of witnesses, including the claimant. *Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Consequently, reviewing courts are loathe to second-guess and overturn credibility choices made by an administrative adjudicator. *See Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.' "); *see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Normally, [the court] give[s] an ALJ's credibility determinations special deference because the ALJ is in the best position to see and hear the witness.").

Here, ALJ Sweeda's subjective credibility choice was reached and explained sufficiently. There is no indication that he failed to apply correct principles of law; the reasons he gave were supported by substantial evidence; and his credibility choice was not patently unreasonable. Accordingly, the residual functional capacity finding is not infirm due to a defective subjective credibility assessment.

## VII.  Step 5 Finding

When Medovich proved that her physical and mental impairments precluded her from performing her past relevant work, she established a *prima facie* case of disability during the period at issue.[22] Under sequential analysis (at Step 5), the burden then shifted to the Commissioner to produce evidence that an alternative job existed which Medovich was capable of performing. *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)); *see also* 20 C.F.R. §§ 404.1560(c), 416.960(c). Additionally, the Commissioner must show a significant number of jobs that she could perform based on her residual functional capacity, age, education, and prior vocational experience exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A); 20 C.F.R. § 404.1560.[23]

---

[22]     *See Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984).

[23]     The Commissioner's regulation interprets this requirement as follows:

Work exists in the national economy where there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.

20 C.F.R. § 404.1566(b).

Generally, administrative judges elicit expert vocational testimony or consult officially-published data[24] to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used. When utilizing vocational experts, administrative law judges pose hypothetical questions reflecting the full extent of claimants' capabilities and impairments to provide a sound basis for the vocation expert's testimony. *See De Leon v. Secretary of Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984).

When hypothetical questions meet that standard, responsive expert vocational testimony generally suffices as substantial evidence supporting a Step 5 finding. *See Mancuso v. Astrue*, 361 Fed. App'x 176, 179 (2d Cir. 2010) (summary order); *see also Salmini v. Commissioner of Soc. Sec.*, 371 Fed. App'x 109, 114 (2d Cir. 2010) (summary order); *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). Conversely, expert vocational testimony given in response to hypothetical questions that do not present the full extent of claimants' impairments, limitations and restrictions, or are otherwise inadequate, cannot constitute substantial evidence to support a conclusion of no disability. *See Pardee v. Astrue*, 631 F. Supp.2d 200, 211-12 (N.D.N.Y. 2009) (citations omitted); *McAuliffe v. Barnhart*, 571 F. Supp.2d 400, 407 (W.D.N.Y. 2008).

## A. ALJ Sweeda's Step 5 Finding

As mentioned in Section III, *supra*, ALJ Sweeda elicited and relied on expert vocational testimony when determining whether Medovich could perform alternative and available work. VE Kane identified three representative jobs

---

[24] *See* 20 C.F.R. § 404.1566(d) (Commissioner will take administrative notice of "reliable job information" available from various publications, including the *Dictionary of Occupational Titles*); *see also* 20 C.F.R. § 404.1566(e) (Commissioner uses vocational experts as sources of occupational evidence in certain cases).

that a person identically situated to Medovich could perform, and provided job-incidence data for each. ALJ Sweeda concluded at Step 5:

> Based on the testimony of the vocational expert, the undersigned concludes that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.

(T. 21).

## B.  *Medovich's Challenge to Step 5 Finding*

Medovich argues that ALJ Sweeda's Step 5 determination is unsupported by substantial evidence because it is based on vocational expert testimony given in response to an incomplete hypothetical question. (Dkt. No. 12, pp. 12-14). Medovich maintains that ALJ Sweeda failed to include "limitations resulting from the Plaintiff['s] stroke and ongoing autoimmune disease." (*Id.*, p. 13). She further claims that "[i]t is undisputed that in October 2009 the Plaintiff suffered strokes resulting in brain damage. The resultant brain damage has caused documented left sided weakness and has resulted in a cognitive impairment including inability to concentration [*sic*] and memory loss." (*Id.*).

## C.  *Application*

ALJ Sweeda's hypothetical question was not defective simply because it did not factor in as many severe limitations as advocated by Medovich. A valid hypothetical question need only incorporate limitations that an administrative law judge finds credible and which are supported by substantial evidence. *See Pertuis v. Apfel*, 152 F.3d 1006, 1007 (8th Cir. 1998) ("The ALJ based his hypothetical question upon those limitations which he found to be credible and supported by the evidence. The limitations which the ALJ included in his hypothetical question were proper and supported by the evidence."). The

hypothetical question posed to the expert exactly matched Medovich's residual functional capacity as determined by ALJ Sweeda, and which accounted for muscle weakness and cognitive impairment . (T. 72). It also factored a person of Medovich's age, education, and work background. (T. 71-72). That residual functional capacity rating and other factors posed to the expert are supported by substantial evidence. Therefore, ALJ Sweeda's use of and reliance on expert vocational testimony was appropriate. *See Mancuso*, 361 Fed. App'x at 179 ("...Commissioner may rely on a vocational expert's testimony ... so long as ... hypothetical is based on substantial evidence." (citation omitted)); *see also Salmini*, 371 Fed. App'x at 114 ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment.").

Medovich provides no good reason to reverse ALJ Sweeda's Step 5 finding for lack of substantial evidence.[25]

## VIII.  Recommendation

The Commissioner's decision denying disability-based benefits should be **AFFIRMED**.

## IX.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

---

[25]     Medovich does not complain of ALJ Sweeda's use of Medical-Vocational Guideline section 202.21 as a "framework" for determining that Medovich is not disabled.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST
AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN
FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed.
App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d
566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b)
of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___15___ day of ___January___ 2015.

Earl S. Hines
United States Magistrate Judge